Mental Health at all argument not to exceed 15 minutes for plaintiffs and 15 minutes to be shared by defendants. Mr. Kugman, you may proceed for the appellants. Thank you. Good morning, your honors Edward Krugman for appellants. I have reserved three minutes for rebuttal. Very well. May it please the court. The central fact of this case which is clearly alleged throughout the complaint is the defendants change in budget policy has prevented and is preventing plaintiffs from getting the services and supports that they need, and that are spelled out in their individual plans of service or their IP OS's. They cannot hire staff and they are not getting out into the community. These facts underlie each of the substantive counts of the complaint. Now there are a lot of issues in this case and I'm going to necessarily going to need to rely on the briefs for most of them. I see my role here principally as making sure I've answered whatever questions the court has because the court may have questions on any number of the issues. So I'm here. I'm here. I'm here to help. Having said that, until there are questions, I'm going to start with Corey Schneider and risk of institutionalization because Corey is the embodiment of the risk of institutionalization that triggers protections under Olmstead and under the integration mandate. You're right, counsel. This case is sort of like a federal court's exam. So there are a lot of issues. Is that client institutionalized yet? He's not, right? He is not. That is correct. And at least on some of the claims, I think Judge Tarnow noted that some of the individuals who were arguably at risk of institutionalization had not been institutionalized. Has that changed for any of them? That has not changed so far as I know. They are all still in their homes. And the case on Corey, Your Honor, is a single point of failure case. It is a risk case. The case on plaintiffs Waskell and Wiesner is both a risk case and an actual segregation case. Just to make clear, for all three of them, it's now been four years since you filed the original complaint and none have been institutionalized. That is correct, although the actual segregation case does not require bricks-and-mortar institutionalization under STYMO. So they have been actually segregated. They are not in the most integrated environment. That's plaintiffs Waskell and Wiesner. Counsel, does it matter? I mean, you have a number of statutory claims. Is it important that certain ones remain viable rather than others? Or if any remain viable, you go on your way? Well, Your Honor, I learned a long time ago not to do let's make a deal if I could avoid it. They all have slightly different elements. They all relate to the same facts. We've had no discovery. We've had no substantive real response from the other side. So it's difficult to say at this time which claims might end up being easier to prove under what circumstances. And different plaintiffs have different claims. Not every plaintiff has the same claim. So the answer is, Your Honor, they all matter. If the court has particular questions or concerns about any one of them, as I said, that's what I'm here to respond to. But moving along on risk of institutionalization. How about about 1396N? What's your best argument? 1396N, what's your best argument for why there's an implied cause of action? Because the statute on its face speaks to the individuals and speaks to specific protections for those individuals. It is rights conferring under Gonzaga. Most, not all, but most of the cases that have addressed that since Gonzaga have so held. And we've gone through the rights conferring language in our brief. Does that apply to... I'm sorry, go ahead. No, go ahead. Go ahead. No, no, go ahead. So just on the history, we have an older case, I think, Wood maybe that's addressed some of these issues. But there have been three intervening Supreme Court cases since that time. We are not suggesting that Wood controls here, Your Honor. There are aspects of Wood that still work in terms of specific elements that have not changed. But we are not suggesting that Wood controls. Okay, thank you. And then just getting back to 1396N. I mean, to me, that provision compared to some of the other ones that you've invoked really seems to be a requirement that the state makes certain commitments to the Secretary of HHS. And if those commitments are not honored, the Secretary would certainly enforce them by cutting off the program or cutting off funding for the state. That to me really seems to be the upshot of that provision, not creating rights and individuals, but requiring the state to make certain assurances to the Secretary and the Secretary can either accept those or reject them. Your Honor, it is very similar to the state plan on 1396A in that respect. They both have lead-ins and the lead-ins say this is what the state plan requires under 1396A. This is what a waiver application requires under 1396N. You then look underneath that, and some of the elements of 1396A have private rights of action because they are rights conferring. And some of the elements of 1396N have private rights of action because they are rights conferring. But particularly under the suitor fix, which we cited in our brief, I think it's 1320A, which says that just because something is in a state plan, and I would suggest to you that the same is true of a waiver application, doesn't mean that the fact that there is power of the Secretary to do XYZ means there's no private right of action. You look at the language, and this Court's cases in both Ability Center against Sandusky and Harris against Olszewski are very clear on that precise point. Do the subsections have to rise and fall together in relation to the private right of action? No, Your Honor. Okay, I mean, because subsection A really speaks of safeguards, but the safeguards seem to affect the state's governance of the programs. You can have necessary safeguards. Let me state this differently. Are you saying that these sections effectively make the state a guarantor that all of the local agencies are complying with every aspect of the statute? Your Honor, the state is a guarantor of that in a very real sense, because the single state agency requirement under the Medicaid Act says ultimately it's the state's responsibility. And they can't, I mean, there are three levels of Medicaid agencies in Michigan, but the single state agency requirement says it's the state's responsibility. How that works itself through, through fair hearings and this and that, can change in different states in different contexts. But it is the state's responsibility. A guarantor of every specific thing? It depends on the thing. It depends on where there's a private right of action. But here, where specific assurances satisfactory to the Secretary are required, and the Secretary has issued regulations saying what those specific assurances are. And it is clear, and we've pleaded out which ones we are relying on, and those are specifically for the health and welfare of the individuals. And that's, that's exactly the way that you get to a regulation. This is, this also came up in Harris against Olszewski. Because Judge Raebler, I saw you leaning forward so perhaps I was misinterpreting but I was, I was anticipating a Sandoval question let me answer it even if you're not, if you're not asking it. Answer it better than I was going to ask. So go ahead. Fair enough. The question is whether the regulation effectively implements is an effectuates I believe is the word in Ability Center and it's followed up in in Harris against Olszewski. And here it does, because the requirement is that there be assurances to protect the health and welfare of the of the waiver individuals. And this secretary through noticing comment rulemaking has set out what those assurances must be to protect the health and welfare, and we are relying on certain of those specific assurances, and that's, that's exactly the way and effectuating regulation works in the, in this context, there are plenty of cases in which effect in this area in which effectuating regulations are given appropriate content. Can I ask you about one other issue. Sure. The ADA and Rehab Act claims. Yes. Are you relying on the guidance issued by the Department of Justice, interpreting Olmstead. We are relying on it in part we are relying on it for what I suggest would be clear in any event, which is that you need not have actual institutionalization that that risk of institutionalization is enough. And the cases that have dealt with it have all said this is not binding, but because the Department of Justice has been given specific responsibility under both the Rehabilitation Act and the ADA to issue these regulations, it is persuasive, and it does effectuate what is what we submit is clearly the purpose of the statute. The DOJ itself says the guidance is not binding and really can't create any rights that are otherwise vested by the statute or the regulation. Correct. That is correct, Your Honor. The point is that when it comes to risk of institutionalization, it cannot possibly be the case under Olmstead that you have to be in an institution, the risk has to have eventuated for you to for you to have a claim. The whole idea is to keep people in the community. And that's what our claim is about. I see my time has expired I'm reserving three minutes for rebuttal. All right, thank you. You're from opposing counsel. Yes. Good morning, Your Honors. My name is Stephanie Carter. I represent Washtenaw County community mental health of the please the court, Your Honor, my colleagues and I have divided our time into three equal parts, and I would like to please look at. Use my time to talk about how our program works, because it is not as has been alleged by the plaintiffs in this matter, Washtenaw County community mental health we actually provide the services to the residents in Washtenaw County. We have now about 630 recipients of CLS services in Washtenaw County. We did not change our method, as the, as the appellants claim Washtenaw community mental health was established in October of 2015, and we have never used the method that the appellants referred to that method was used for just a few years by our predecessor organization, and it drove them out of business because they they spent too much money, and their executive director resigned. The method that is used is the method that we have from the Medicaid regulations, we put together a budget. The budget is made up of the number of hours that are decided, Your Honor, there's a personal plan that's put together for each recipient in a meeting that is attended by the recipient his guardian, and the agents from Washtenaw community mental health and they decide what are the things that the recipient wants and needs. And these services are to get them out into the community. These are not medical services. These are not psychiatric services. And the Medicaid provider manual specifically state CLS is not intended to meet all of the individual needs and preferences, as some may be better met by community and other natural supports. That's what we try to put together. Once that budget is decided, and the number of hours is multiplied by the service hours. The service hour rate is handed down to us through our regional authority. We don't set that rate plaintiffs are also mistaken when they say that these are staff hours. They're not staff hours their service hours. I have to ask you. Some of this is very helpful in clarifying the case other things sound a little bit like issues that might require some fact development or a little bit of a disagreement over the facts. And there are legal, legal arguments that are made by the plaintiffs that you disagree with or, or are you are there a specific claim to your stating was not fairly articulated in the complaint. Well, obviously is that the money has been reduced by the rebut budget I want to make sure we tied your points to the key legal arguments in the case. Thank you. I, first of all, with regard to whether they are factual arguments. I believe that the district judge could correctly use the facts that were contained in documents attached to or refer to claim in plaintiffs complaint, and then the amended complaint plaintiff specifically refers to the hearing that was held, and they cite some of the facts that were articulated by our representative at that hearing. So we believe that the district court could correctly look at those factual issues that were cited in things that were attached to or referred to in plaintiffs brief, but with regard to the, the, the legal arguments that have been raised. I submit to the court that none of the arguments that plaintiffs have put forward show any. And they haven't articulated a reason, a legal reason or facts that support their reason why they are entitled to the particular calculation method that they advocate and that's the issue in this case your honor, whether they're claiming an entitlement to be able to take our budget and add on to it. None of the reasons that they cite show and they haven't said to this court or to the court below why they have a right to articulate how their benefits will be provided to them. So I say that with regard to all of the legal arguments that have been raised. Council. I don't want to put words in your mouth, but it almost sounds as though you're, you're saying that if the services being provided, have not been reduced to the recipients in any meaningful sort of way, then plaintiffs are not entitled to prevail on the legal arguments, although I imagine the legal arguments and the provision of services are intricately intertwined in a sense but is that, am I getting a correct sense of your argument here. I'm not sure I'm, I'm not sure I'm about to answer your question your honor but what I, what I am saying is that there is no legal basis, no legal basis and no legal theory, under which they are entitled to decide the method that their benefits are calculated, your honor, one of the plaintiffs here has is has 120 hours of services. That's what they have now. Another, it has 150 hours of services. So, within that framework, our position is that they have the hours that they need under their individual plans of service. Well counsel, let's say, I don't think they're complaining about the services set forth in their plan, I think they're complaining that the money allotted is insufficient to procure those services but what if you had a perfectly good plan, and you budgeted $4 an hour. Are you saying they wouldn't, they wouldn't have a claim. Well what I'm, what I'm saying is that at this point, all of the recipients, well because of COVID they've actually gotten a $2 raise they're getting $19 per hour now for the services in their plans, not one of the plaintiffs has ever even at the specific invitation of the district court stated one service that they have not been able to get to get not one. And I don't want to take the time of my colleagues, if the court will allow, I will yield to to my, my colleagues. All right. We've been out of time for a little bit so we'll move to the next argument. Good morning. All right. Good morning, your honors Marcy Stepanski on behalf of the CMHPSM, the regional defendants. With respect to the plaintiff's arguments they really kind of all boil down to plaintiff's desire to sort of dictate the method of which the budget is calculated so it's sort of to take off from sister counsel's position. What they would like to do instead of having an hourly rate for CLS supports is sort of divide that up and and have a different allocation or an additional allocation for say transportation, certain activities, and that's just, that's not a manageable budget. And they don't have a legal right to dictate the budget calculation. And, and part of the reason for that is all of their medical medically necessary services can be provided. And if they're dissatisfied with the level of service. They have the opportunity at any time to reopen their individual plans of service, seek additional CLS hours, and that's not the issue that they're not complaining about the hours allotted in their plans. They're complaining about the fact that the money you give them is insufficient to procure those hours. Well your honor what they can do and what they have done successfully in the past is if they're not satisfied with that because that's sort of how it's calculated and what they can do is ask for additional hours to compensate for any kind of shortfall. And some of the plaintiffs have actually gone through the administrative process in the state, and have gotten additional hours to overcome any kind of shortfall that they perceive they've successfully done that. Now, there's also a difference as a district court recognized between needs and wants, and it's very difficult in this situation because we can't allow a certain like a handful of plaintiffs wants to prioritize over several thousand counsel how does one. How does one decide needs versus wants on a pleading. Well, I basically they have to plead that these are medically necessary services and if they are medically necessary, they will get them because there's an administrative process, whereby they can go, not only through that but into the state court system then, and it will be determined whether they're medically necessary. If, if the plan already conceded that they're necessary. And that's what they're alleging that they're not saying there's anything wrong with these plans. It's that they can't get those services with the money that they're getting. So, I don't understand how this, how this helps. I mean, you've already conceded that it's medically necessary. Well because when they go through the process your honor they're able to obtain additional CLS hours. If there's some kind of deficiency in the services that they're supposed to receive under the plan, they can receive additional hours which equates to additional funds. And if, for example, those are agreed upon an individual plan of service, they proceed through the administrative process, simply to sit down so successfully in the past, where they've advocated for additional hours and they've obtained those through the administrative process. But counsel, I think I'm missing something because if I've already agreed that I need 120 hours, and you've agreed that I need 120 hours, and I don't think I need any more hours, and you don't think I need any more hours. You're saying the way to deal with the fact that the money is insufficient is to go ask for more hours. So I have money for 150 hours, and I use it to obtain 120 hours, but that's not consistent with this whole system you're not supposed to inflate hours, so that the person has enough money to buy the lesser hours. Well, what the plaintiffs are trying to do, they're actually trying to sort of double down on it, the hours consist themselves of activity staff transportation and what the plaintiffs want to do is take that hourly rate, and then add to it, additional monies for staff for transportation, which would really inflate the budget and make it really unmanageable and this is factual, isn't it. No, because it keeps coming back your honor to I think that the most important thing to keep in mind when evaluating this case that keeps coming back to, just like many other health plans, a particular recipient doesn't have the right to dictate how the budget is calculated. But they may not have that right and I think I agree with you that they don't have a right to a particular formula. But this is just, it's just a circumstance that there used to be a different formula, you can take that out, and they still are claiming that the formula you have can't get them the hours, and that whatever formula you use, you can pick it, it has to be enough to get them their hours. But they do have the, but they do have the opportunity that if they're not getting medically necessary services to obtain relief through the administrative process and that's what it really is this medically necessary services. And like everyone they have to work within a budget because there are only limited resources that the federal provides to the state and that the state provides to the regional participants are literally thousands of other clients recipients who also need to have funding. And when you start giving an inflated amount to a handful. It really detracts from funding for other people who also have severe diagnoses and need services as well. It's just, there's not unlimited resources. We've been out of time for a while on this argument. Unless members of the panel have more questions we'll move to the next argument. Thank you for your indulgence. Thank you. Good morning, your honors Tracy Vandenberg assistant attorney general on behalf of defendants Robert Gordon, and the Michigan Department of Health and Human Services, your honor from your honors from the state's perspective, at least under 1396 and 1396. We all that's required and this is under Westside mothers. Is that the state provide the financial assistance. I think what brother counsel for plaintiffs implied in his argument is that the state itself was required to make sure that not only was the state required to pay for services but the state was in fact required to make sure that every service actually happened. And in fact that's in direct contravention to this court's established precedent in Westside. So I'd like to point that out. I'd also like to point out that at least in this case in law school one which is cited in the record. The state has intervened in ensuring its obligation that the assistance was paid for. In fact, the state intervened on this case is long history. On several occasions and I lost the one, or a HIV, one, seven, where the state intervened, so that the plaintiffs in this case were able to invoke their administrative remedies to challenge the budget. And I, you know, I think that's an important point here that all of these plaintiffs have administrative remedies. These plaintiffs, in fact, use their administrative remedies with the state's assistance to make sure that they had that process. In fact, they originally had due process claims, which they subsequently dismissed. And under those administrative remedies, and I think this is important because I know this case sometimes looks like, like, should this be a 56 and should it go back? But I do think we can't ignore the fact that after those administrative remedies occurred that not one of the plaintiff's budgets was actually reduced in this case. And in fact, it's even in their complaint. Were any of the budgets increased as a result of the administrative remedies? Yeah, actually, well, the budget since has been increased, Your Honor, but I just want to state how this case started. I understand that it's been a while. But, of course, initially, based on the new budgeting methodology, the plaintiff's concern was that that methodology effectively caused a decrease in the budgets. So, in fact, when they appealed, the budgets were all increased back to the pre-May 2015 methods. And since then, they've been increased subsequently. So really what the plaintiffs are asking for is just a different budget methodology. And I think this goes back to what Judge White was saying. I mean, I understand her concerns for sure. Isn't this a question of fact? Well, it's interesting because really the issue here is that the plaintiff's claims are so speculative that that is why I believe their complaint does not survive a motion to dismiss because they really are just challenging the methodology. And they're saying this particular way, this formula is the way, the thing that's causing a risk of institutionalization, a risk of not getting these services, when in fact they give nothing tangible. Is the number $18 an hour? Is the number $20 an hour? They don't say that. But counsel, it sounds like you're making conflicting arguments. I'll tell you why I'm perceiving it that way. Sure. Because their complaint is more specific than that. They're alleging that the particular plaintiffs are having this particular problem. They're having to get services. They're only able to get a certain number of hours on this budget. They're having to have elderly family members take care of them. They're not going to be able to maintain it indefinitely. And so those are specific. But then you say they're not coming up with a number that's enough. As you said, is $19 enough? Is something else enough? But at the same time, you're complaining that they are, not that they're advocating, but that they're demanding a specific budget method. And so, is it too specific to ask for a particular method? Or is it not specific enough not to give you a particular hourly rate? Well, I think the answer is, frankly, in a way, and I completely see your point. But the method itself, in a sense, first of all, the prior method was not permissible under Medicaid. So it did violate Medicaid rules. So we can't have that method. But also, I mean, I think the issue is that the methodology itself doesn't necessarily change the amount of the budget. Because then we're just playing with numbers. I think that's my point. And so maybe their claim is, we need X amount of dollars. And that X amount of dollars probably could be obtained in any budgeting methodology. But that's not what they claim here. They claim they just attack the methodology. And I think the reason they do that is because, frankly, it's what they're looking for and what we can never have, frankly.  Every case, Olmstead, all of the Medicaid cases, I mean, there's limitations, correct? But what they really want is a limitless budget. A budget that, and we can, and I would also put forth that I think. Counsel, could you wind up your comments? Oh, I'm sorry. We've been out of time for a while. But just go ahead and wind up. Oh, and so, you know, as I said, I think we should, you know, I would just ask the court to affirm the district court's ruling here. I think they got it. Thank you for your time. Thank you. And we'll hear rebuttal. Thank you, Your Honor. Some very short points. One is that with respect to the use of the transcript and so forth, we dealt with that in our reply brief, and I'll simply call the court's attention to pages three and four of our reply brief. Two, on Westside Mothers. Westside Mothers, this is a payment case. Our case here is a payment case. We're saying there is not enough payment. We have pleaded exactly what Westside Mothers said was required. And, you know, we're quite aware of the case and we've pleaded it. Three, council said that the previous methodology was not permissible under Medicaid. With great respect, that's simply not true. And although there was a finding by the district court on the preliminary injunction motion that that was the case. A main purpose of the amended complaint was to lay out in great detail why that is not true. And nobody has ever cited to anything that says it is true. And we've addressed this at length in our briefs. I'm simply flagging that to the court. Four, Judge White, to your question about budgeting methodology. The waiver says two things about budgets. It says the budgets must cost out the individual's services and supports. That's what we are asking for. It also says the budget, quote, must be sufficient to implement the IPOS, close quote. There may be lots of different ways to do those things. But the bottom line of our claim is that's not being done. We are not trying to dictate a method, although we are saying that for ADA purposes, the fact that there was a method in place that did work means that it's always permissible to go back to a previous ADA compliant method. So that's an ADA point. But, again... Before you finish, about 1396A10B. I think it's the right provision. That talks about, one, being entitled to the amount of medical assistance that's made available to others. Sort of some equality principle, I guess. That two people who are beneficiaries, I think, of the program have the right to the same benefits, essentially. But, am I right that that's a comparison between different disabled individuals who would be covered by the law? Your Honor, the... First of all, we are not making a comparability claim. So I want to make that clear. Second, so I would need a minute to think about it, and I've got three seconds. But let me do the best I can. Under Section B. Because I don't think you're saying that one group of disabled individuals is being disfavored over another group of individuals who would be beneficiaries. We are in one respect, Your Honor. And that is that the budgeting... There is no budget requirement for people for whom agency services are an acceptable option. We have pleaded, and it's in the record, and there are all sorts of factual issues as to why agency services here are not an acceptable option. And I want to simply flag pages 3877, 3894, and 3895 of the record. Because that relates to agency services not working for these individuals. What we are saying is that these individuals have a right to certain kinds of services, and they're not getting them. And that's really what this case is about. The IPOS and all of the plans talk about the services that these plaintiffs are entitled to get. We have pleaded in great detail that they're not getting them. And for that reason, each of the counts, Judge White, I submit, each of the counts of the complaint states a claim for relief, and the judgment below should be reversed. All right. Thank you very much. And thank you for your arguments. And the case shall be submitted. Thank you. Thank you. That concludes the arguments on this case. And when the clerk is ready, the next case can be called.